VIRNA L. SANTOS, SBN 150017
Santos Law Group
1225 E. Divisadero Street
Fresno, CA 93720
(559) 500-3900 | (559) 500-3902 (Fax)
vsantos@santoslg.com

Attorney for Jacob Eric Blanco

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>                   Plaintiff,<br><br>vs.<br><br>JACOB ERIC BLANCO,<br><br>                   Defendant | Case No.: 1:17-CR-140 NONE<br><br>DEFENDANT'S SENTENCING MEMORANDUM |

I.      INTRODUCTION

On May 15, 2020, Jacob Blanco pleaded guilty to all six counts of the Indictment charging him with: Counts 1-5: Sexual Exploitation of a Child and Attempt, in violation of 18 U.S.C. § 2251(a) and (e), involving seven victims; and Count 6: Receipt and Distribution of Visual Depiction of a Minor Engaged in Sexually Explicit Conduct and Attempt, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1).  The sentencing hearing is set for October 8, 2021, at 10:00 a.m.  The defense respectfully requests that this court sentence Mr. Blanco to 300 months in custody for the reasons set forth herein.

II.     OBJECTIONS TO PRESENTENCE REPORT

A.  Objections to Special Condition 12

The second paragraph of special condition 12 prohibits the possession and viewing of pornography involving adults while on supervised release.  Mr. Blanco objects to this portion of special condition No. 12 because it is not reasonably necessary under the facts of his case.

DEFENDANT'S SENTENCING MEMORANDUM - 1

A district court may impose a condition of supervised release if it "involves no greater deprivation of liberty than is reasonably necessary" to punish, deter, protect the public from or rehabilitate the defendant. 18 U.S.C. § 3583(d)(2). The condition should also "reasonably relate[ ]" to "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3583(d)(1); id. § 3553(a)(1).  In Mr. Blanco's case, there is no evidence of any relationship between adult pornography and his offense conduct.  Because the proposed special condition would unreasonably impinge on Mr. Blanco's liberty, it should not be imposed.

B.  Because Mr. Blanco is indigent, the Justice for Victims of Trafficking Act Special Assessment Should not be Imposed.

Despite the prospect of Mr. Blanco's long sentence, the Probation Officer recommends that a $30,600 assessment be imposed.  Pursuant to 18 U.S.C. § 3014, the Justice for Victims of Trafficking Act Special Assessment may be imposed on non-indigent defendants.  As the PSR indicates. Mr. Blanco has no assets.  Although he may be employable, it is unlikely that he will earn income to pay the assessment.  An analysis of a defendant's future financial situation is warranted. (See *United States v. Clarke*, 979 F.3d 82, 101 (2d Cir. 2020); *United States v. McMiller*, 954 F.3d 670, 675 (4th Cir. 2020); *United States v. Shepherd*, 922 F.3d 753, 758–59 (6th Cir. 2019); *United States v. Barthman*, 983 F.3d 318, 322 (8th Cir. 2020); *United States v. Kelley*, 861 F.3d 790, 801 (8th Cir. 2017). "The ordinary meaning of 'indigent' therefore includes both someone who is poor today and someone who lacks the means to earn the necessaries of life in the future." (*United v. Graves*, 908 F.3d 137, 141 (5th Cir. 2018).)  Because he is indigent, Mr. Blanco respectfully requests that this assessment not be imposed.

///

///

///

III.    STATEMENT OF FACTS

A.  Background

Mr. Blanco comes before this court as a 29-year old who took full responsibility for his actions after having survived a tortured childhood and adolescence that almost foretold this outcome.  Shortly before his arrest, Mr. Blanco sought mental health assistance because he recognized that he needed help.  He was referred to another therapist and, before he could obtain meaningful help, he was arrested.  *See* Exhibit 1 (sealed), p. 1.  From the moment of his arrest, Mr. Blanco expressed contrition and cooperated by giving a full statement.

Having suffered from various undiagnosed mental health disorders and endured many adverse childhood experiences including a traumatic incident of child sexual abuse, Mr. Blanco —living alone for the first time—succumbed to a compulsive sexual interest in children.  "He feels horrible about what he did and how this has affected his family." PSR 15, ¶ 55.  Mr. Blanco seeks a sentence that will recognize that he is not only willing to rehabilitate but has demonstrated the potential to do so.

The proposed sentence of 720 months is merely punitive.  It fails to recognize that Mr. Blanco was not born bad with an intention to victimize children.  It also disregards the latest neuroscience that supports that, with appropriate treatment and medication, his brain can be rewired to control and not repeat his unlawful conduct.

Mr. Blanco's offense conduct dates to June 2016, when he was 24 years old.  He has no criminal history.  Mr. Blanco suffered from multiple untreated psychiatric conditions, including social anxiety disorder and obsessive compulsive personality disorder, characterized by compulsive preoccupation with perfection.  Two members of his family, his sister Breanna and brother Jose Jr., suffer from bipolar disorder.  Breanna has been hospitalized on multiple

occasions for depression after attempting to hurt herself. PSR 23, ¶ 133.  In 2008, Mr. Blanco's parents separated for a year due to his father's methamphetamine abuse and violence.  Mr. Blanco's mother admitted that her son witnessed his father's drug addiction and domestic violence.  Mr. Blanco's father is a regular marihuana smoker.  PSR 23, ¶ 134

At age 11, Mr. Blanco was a victim of sexual abuse perpetrated by his sister's boyfriend.  Mr. Blanco described how her sister's 13-year-old boyfriend forced his penis into the defendant's mouth. The defendant did not tell anyone until three years ago.  PSR 23, ¶ 135.

As a child and young teenager, Mr. Blanco hardly talked to anyone besides family members.  This may be why he refused to attend school and had difficulty communicating with teachers and classmates.  Dr. A.A. Howsepian, a psychiatrist and defense-retained expert, diagnosed Mr. Blanco's childhood inability to speak as Selective Mutism based on Mr. Blanco's report that, "I wouldn't talk to adults at school, teachers, my grandparents, uncles, or aunts, but I would talk with my friends and people at home."  Mr. Blanco revealed that this started when he was 5 or 6 years of age.  *See* Exhibit 2 (sealed), Dr. A.A. Howsepian's  opinion dated June 11, 2019, p. 7, sealed.  Further, this profoundly disabling condition is characterized by Anxiety Disorder.  The person does not speak in circumstances where one would be expected to speak.  Dr. Howsepian further opines that the "'selective' aspect of this disorder refers to the fact that those who suffer, only do not speak to some selected adults."  Exhibit 2 at p. 11.  Instead of seeking treatment for their child, Mr. Blanco's parents allowed him to drop out of school after the eighth grade.  Mrs. Blanco served two weeks in jail as a result of her son's truancy.  PSR 23, ¶ 136.  Dr. Howsepian further opines that had Mr. Blanco's Selective Mutism been diagnosed and adequately treated during childhood "his life trajectory would have likely been vastly different."  *Id.*

DEFENDANT'S SENTENCING MEMORANDUM - 4

Mr. Blanco also suffered childhood physical abuse.  His brother Luis would assault him frequently with his fists, between ages of 10 to 15.  One of his brother's friends would also assault Mr. Blanco.  PSR 23, ¶ 137.  Aside from the lack of attention to Mr. Blanco's obvious mental health conditions, Mr. Blanco had little adult guidance.  Specifically, he stated that his patents allowed him to do whatever he wanted, including quitting school.  During his probation interview, he wished that his parents had disciplined him and done more to get him back into school.  PSR 23, ¶ 138.

Mr. Blanco acknowledges that he needs to set limits for himself, follow the rules, and seek mental health treatment.  PSR 24, ¶ 142.  Mr. Blanco requests an opportunity to rehabilitate through a sentence that recognizes his potential and sincere desire for rehabilitation, the availability of therapeutic resources through the Bureau of Prisons (BOP) and the neuroscientific evidence that shows that with appropriate cognitive behavioral therapy, his brain can be rewired.

IV.   A SENTENCE OF 300 MONTHS IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO PUNISH MR. BLANCO, DETER HIS CONDUCT AND ALLOW FOR REHABILITATION.

A.  Legal Standard for Imposing a Federal Sentence

The Supreme Court has clearly stated that the Sentencing Reform Act of 1984, rather than the Sentencing Guidelines, governs sentencing decisions.  *United States v. Booker*, 543 U.S. 220, 260-61 (2005); 18 U.S.C. § 3553(a).  The Guidelines are no longer the only or even primary consideration in fashioning a sentence in a particular case—they are purely advisory. *Id.*  As a result of this paradigmatic shift, the judge's choices in sentencing a particular defendant have been greatly expanded.  *Cunningham v. California*, 549 U.S. 270 (2007) (stating that judges are no longer tied to the sentencing range indicated in the Guidelines).  The "overarching" directive of sentencing is that "[t]he court shall impose a sentence sufficient, but

DEFENDANT'S SENTENCING MEMORANDUM - 5

not greater than necessary, to comply with the purposes [of sentencing]." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

This "parsimony principle" is not mere precatory language, but is a key—in fact, the key—requirement that a sentence must satisfy. *See also Nelson v. United States*, 550 U.S. 350 (2009) (per curiam) (reaffirming prior opinions stating that guidelines are not to be presumed reasonable); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*) (sentencing guidelines to be given no more weight than any other § 3553(a) factor). Where the sentencing court determines that the defendant should be sentenced outside the Guidelines' range, the court need not justify the variance based upon "'extraordinary' circumstances." *Gall v. United States*, 552 U.S. 38, 47 (2007). Neither must the court apply "a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* at 595. Instead, the sentencing judge need only "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 597.

B. The Statutory Sentencing Factors Support a Variance

In determining an appropriate sentence, the Court must consider the statutory sentencing factors set forth in 18 U.S.C. § 3553, including, among other factors, the nature and circumstances of the offense; the history and characteristics of the offender; the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence; and the need to avoid unwarranted sentencing disparity. 18 U.S.C. § 3553(a). The Court must first calculate the defendant's guideline range. *Gall v. United States*, 552 U.S. 38, 50 (2007).

DEFENDANT'S SENTENCING MEMORANDUM - 6

Although the guidelines are the "starting point and the initial benchmark," they are not the only consideration. *Id*. The Court must not presume the guideline range is reasonable, but must make an individual assessment of the § 3553(a) factors based on all the facts presented. *Id.* at 51. While the court may use its discretion in how to balance the relevant sentencing factors, unjustified reliance on a single § 3553(a) factor may be a symptom of unreasonableness. *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008). "A sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (internal citations omitted).

"Factors ordinarily considered irrelevant in calculating the advisory guideline range, or in determining whether a guideline departure is warranted, can be relevant in determining whether to grant a variance. . . ." *United States v. Chase*, 560 F.3d 828, 830 (8th Cir. 2008). In fashioning a sentence sufficient but not greater than necessary to achieve the sentencing goals, district courts "are not only permitted, but required to consider 'the history and characteristics of the defendant.' . . . As a consequence, factors such as a defendant's age, medical condition, prior military service, family obligations, entrepreneurial spirit, etc., can form the bases for a variance even though they would not justify a departure." *Id*. at 830-31.

      1.   Untreated Mental Health Conditions

Mr. Blanco sought treatment in the weeks preceding his arrest in May 2017. He expressed his desire to curb his behavior, telling the therapist, "I want to know why I am like this and how to stop." Exhibit 1, p. 1 sealed. It was not until his time in custody that he was fully evaluated, and his multiple mental health conditions diagnosed. Dr. AA Howsepian conducted two evaluations at the defense's request. Exhibits 2 and 3 (sealed). He also responded to

DEFENDANT'S SENTENCING MEMORANDUM - 7

Government's expert psychologist, Dr. Susan Napolitano.  Exhibit 4 (sealed).  In summary, Dr.

Howsepian concluded that Mr. Blanco:

> currently suffers from (1) Social Anxiety Disorder (also referred to as 'Social Phobia'), (2) Avoidant Personality Disorder, (3) Obsessive-Compulsive Personality Disorder, and (4) Pedophilic Disorder, Nonexclusive Type, Sexually Attracted to Females. He also suffered from these conditions at the times of his current offenses. In addition, he has a clear childhood history of Selective Mutism, with persisting subsyndromal symptoms, and a childhood history suggestive of either Oppositional Defiant Disorder or Disruptive Mood Dysregulation Disorder, in addition to a Learning Disorder.

Exhibit 2, evaluation, p.2, ¶4.

Dr. Howsepian's evaluation also includes Mr. Blanco's family psychiatric history, his

own history of treatment and manner in which Mr. Blanco's psychiatric and psychosocial

histories contextualize his involvement in the current offense.  See Exhibit 2, pp. 16-20.

Notably, Dr. Howsepian opines that Mr. Blanco's conditions are susceptible to recognized

treatment:

> Jacob's being highly motivated for treatment and his ability to engage in treatment by recruiting the aforementioned strengths both enhance his ability to benefit from treatments that, in my professional opinion, to a reasonable degree of medical certainty, will provide the tools that he will need in order both to dampen and to manage his disordered sexual interests and impulses, to a degree that he would no longer pose a significant danger to the community.

> He explicitly states that he feels guilty for what he has done, that he views his sexual attraction to children as "a problem," and he expresses what appears to be sincere regret and remorse for his actions. His spontaneously expressing empathy for his victims is also noteworthy in this regard insofar as this further provides a foundation for motivating him sincerely to engage in therapy that could attenuate these interests and impulses. He also reports at least some sexual interest in adult females (reflected, in part, by his interest in both child and adult pornography), providing a foundation for future further growth in that direction.

Exhibit 2, p. 20.

///

DEFENDANT'S SENTENCING MEMORANDUM - 8

Dr. Howsepian further opines:

> It is important to note that, according to the DSM-5, Pedophilia itself is not considered a psychiatric disorder, but that Pedophilic Disorder is, and that it is possible for Pedophilic Disorder to revert to Pedophilia by way of ameliorating some of those symptoms found in Pedophilic Disorder that are not part of Pedophilia, e.g., marked distress or interpersonal difficulty. It is also important to note, therefore, that the goal of completely eliminating pedophilic interests and impulses in someone with Pedophilic Disorder is, in almost all cases, unrealistic. It is of critical importance to reiterate that Jacob has never undergone any form of psychiatric treatment. His motivation and his strengths strongly suggest that he will be focused and engaged in treatment and that this treatment will, to a degree sufficient for his not being a danger to the community, be effective.

*Id*. at pp. 21-22

A sentencing court must consider the nature and circumstances of the offense; history and characteristics of the defendant; and the need for the sentence to provide just punishment, adequate deterrence, protection to the public from further crimes of the defendant, and correctional treatment to the defendant. *Tapia v. United States*, 564 U.S. 319, 324 (2011).

        a. Adverse Childhood Experiences During Crucial Brain Development Influenced Mr. Blanco's Unlawful Conduct.

Courts are now using scientific information about the development and neuroplasticity of the brain to fashion sentences and rehabilitation programs that account for the unique characteristics of the young brain. *See* "Brain Science Is Reforming Juvenile Justice Policy And Practice," The Center for Law, Brain & Behavior (CLLB), https://clbb.mgh.harvard.edu/juvenilejustice/.

Neuroscientists have found that the adolescent brain is still developing, that it is highly subject to reward—and peer—influence, and that its rate of development varies widely across the population. They have developed basic tools that offer data with which to judge the potential for juvenile desistance, recidivism, and rehabilitation.

DEFENDANT'S SENTENCING MEMORANDUM - 9

> With its ability to examine the workings of the teenage brain, neuroscience is improving our understanding of adolescents, and potentially, juvenile offenders. Through their window into the brain, neuroscientists understand, for example, that adolescents mature at markedly varied rates. The presumed trajectory of brain development, demonstrated in existing "bright line" age cut offs for voting, military service, and drinking, however, is not reflective of this variability in brain maturity. Similarly, neuroimaging research by CLBB faculty (*Somerville*, 2010) clarifies that it is teenagers' heightened vulnerability to reward that drives risky behavior, contrary to longstanding beliefs that teenagers are unable to gauge risks. They can often recognize risks, but incomplete development of brain mechanisms related to modulation of impulsive behavior reduces their tendency to heed those risks.
>
> Science may also help us understand which juvenile offenders are likely to commit future crimes and which may not. A longitudinal study, "Pathways to Desistance" (Mulvey, 2011), has collected significant data on factors such as substance abuse and instability in daily routine that lead to youth recidivism. The seminal paper, "Rewiring juvenile justice: the intersection of development neuroscience and legal policy" (Cohen and Casey, 2014), elucidates how key new scientific findings about the development of the adolescent brain may inform policy.

The Center for Law, Brain & Behavior, https://clbb.mgh.harvard.edu/juvenilejustice/ (last visited September 22, 2021.)

The PSR asserts that Mr. Blanco began acting on his pedophilic impulses one year prior to his arrest, between the ages of 24 and 25 years old. As will be further discussed in detail below, neuroscience research validates what most parents know, that younger adults have difficulty controlling impulses. That difficulty is exacerbated for individuals like Mr. Blanco who also suffer from psychological and psychiatric disorders. Further, the Supreme Court has recognized that juveniles have a lower capacity for mature judgment. "[A]s any parent knows and as ... scientific and sociological studies ... tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.'" *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)).

DEFENDANT'S SENTENCING MEMORANDUM - 10

b.   Mr. Blanco's Multiple Adverse Childhood Experiences Reveal a
Childhood Affected by Toxic Stress.

Mr. Blanco grew up in household where dysfunction and abuse reigned.  His father abused controlled substances.  His mother was a victim of domestic violence.  Two siblings suffer from mental illness.  Mr. Blanco's own brother physically beat him as a child.  He was sexually abused by his sister's boyfriend at age 11.  Mr. Blanco refused to go to school beyond eighth grade.  His parents threw in the towel on his upbringing and did nothing to help address the multiple obvious mental health difficulties he was having throughout childhood, including his selective mutism.  Mr. Blanco did not have the resources with which to address the mental health disorders that developed or exacerbated as a result.

A trauma-informed examination of Mr. Blanco's personal history and characteristics demonstrates that just as his behavior was molded by these negative experiences, his behavior can change with proper treatment and rehabilitation.  Science is increasingly understanding the connection between experiencing childhood trauma and poorer outcomes later in life.  The Centers for Disease Control acknowledges that:

> [a] large and growing body of research indicates that toxic stress during childhood can harm the most basic levels of the nervous, endocrine, and immune systems, and that such exposures can even alter the physical structure of DNA (epigenetic effects). Changes to the brain from toxic stress can affect such things as attention, impulsive behavior, decision-making, learning, emotion, and response to stress.

https://www.cdc.gov/violenceprevention/aces/fastfact.html?CDC_AA_refVal=https%3A%2F%F (last visited December 6, 2020).

ACEs are: "potentially traumatic events that occur in childhood (0-17 years) such as experiencing violence, abuse, or neglect; witnessing violence in the home; and having a family member attempt or die by suicide." *Id.*  Also included are aspects of the child's environment that

DEFENDANT'S SENTENCING MEMORANDUM - 11

can undermine their sense of safety, stability, and bonding such as growing up in a household

with substance misuse, mental health problems, or instability due to parental separation or

incarceration of a parent, sibling or other member of the household.  *Id.*

      Adverse childhood experiences include instances of emotional, physical and sexual

abuse, physical and emotional neglect, and household disruptions such as domestic violence,

divorce, or incarcerated parent.

      Cumulative adversity, especially when experienced during critical and sensitive periods

of development, is a root cause to some of the most harmful, persistent, and expensive health

challenges facing our state and nation—from heart disease to homelessness.  It is now known

that one important way in which ACEs increase risk of poor physical, mental, and behavioral

health is through prolonged activation of the biological stress response and associated changes

in brain development, as well as immune, hormonal, and genetic regulation.  These long-term

changes are known as the toxic stress response.  There is now "extensive, scientific knowledge

about the effects of excessive activation of stress response systems on a child's developing brain,

as well as the immune system, metabolic regulatory systems, and cardiovascular system."

Harvard University Center of the Developing Child, ACEs and Toxic Stress: Frequently Asked

Questions, https://developingchild.harvard.edu/resources/aces-and-toxic-stress-frequently-

asked-questions/.

      Dr. Howsepian prepared Exhibit 3, a Supplemental Evaluation and Opinion dated June

14, 2021, specifically addressing Mr. Blanco's multiple ACEs and discussing relevant research.

> "[A]ccording to K. Hughes, MA Bellis, KA Hardcastle, and colleagues (2017),
> in their systematic review and metaanalysis, 'Studies are increasingly identifying
> the importance of early life experiences to people's health throughout the life
> course. Individuals who have adverse childhood experiences (ACEs; during
> childhood and adolescence [up to 18 years of age]) tend to have more physical

and mental health problems as adults than do those who do not have ACEs and ultimately greater premature mortality. ACEs include harms that affect children directly (e.g., abuse and neglect) and indirectly through their living environments (e.g., parental conflict, substance abuse, or mental illness). Physiological and biomolecular studies are increasingly establishing how childhood exposure to chronic stress leads to changes in development of nervous, endocrine, and immune systems, resulting in impaired cognitive, social, and emotional functioning and increased allostatic load (ie, chronic physiological damage)'(p. 356). That meta-analysis confirms the substantially increased health risks to adults of a history of multiple ACEs. In addition, the CDC and state health departments now utilize a set of questions about ACEs that are being used in the Behavioral Risk Factor Surveillance System (BRFSS) to obtain ACEs scores on random samples of adults on a state-by-state basis and these scores' relationships to a wide variety of public health issues. ACEs scores range from 0-10. Only one-third of adults have an ACEs score of zero. 15% of adults, on the other hand, have ACEs scores of at least four. Most adults with one ACE will have others as well. The idea behind this score, and its substantial importance, lies in the fact that it shows that various negative stressors early in life (prior to age 18) can have substantial negative effects later in life, in fact, throughout the lifespan, by way of biological stress on the developing brain."

Exhibit 3, p. 4; ¶ 2.

Dr. Howsepian further explains that a Toxic Stress Response occurs,

"when a child is exposed to frequent or severe or prolonged trauma without adequate support from trusted adults. Such stress can—both immediately and in the long run—result in alterations in the brain's architecture and function, eventuating in social maldevelopment, mental illness, and physical health challenges.  Furthermore, by way of 'epigenetic' mechanisms, such stressors can, in fact, alter gene expression with resultant widespread biological changes. These gene alterations are such a foundational part of one's biology that can, then, be passed on to future generations. ACEs, therefore, not only affect one immediately, but also in the long run— across the lifespan, and also can affect one's progeny.

*Id.* at. p. 4-5; ¶ 3, 4.

Per Dr. Howsepian's evaluation, Mr. Blanco's

ACEs score was at least a 6 out of 10 (7 out of 10 if the 10th ACEs item regarding incarceration is interpreted broadly, as it sometimes is), insofar as he reports having been having been physically injured by his mother who struck him with a belt in a manner that, he said, left marks on his body, felt unsupported and unloved by multiple family members (including Jacob's older brother who was physically abusive toward Jacob and, at times, his parents), often did not feel he

was protected (in part due to parental neglect) and, in fact, (as noted) reports often being physically attacked by his brother, witnessing his mother's being physically abused by his father (who threw a beer can at Jacob's mother, lacerating her scalp), having parents who abused drugs (marijuana and methamphetamine) and alcohol resulting in their neglecting his and his siblings' needs (e.g., leaving them entirely alone, unsupervised, while their parents 'partied'), having multiple siblings who struggle with mental illness (including a sister who was admitted to and treated in a psychiatric inpatient unit, and his brother's having been diagnosed by a psychiatrist with bipolar disorder, for which he was placed on psychiatric medications, at least as a teenager.

Id. at p. 5; ¶ 2.

According to Dr. Howsepian's evaluation, Mr. Blanco experienced: 1) physical neglect; 2) emotional neglect; 3) incarcerated parent; 4) mother victim of domestic violence; 5) parental substance use disorder; and 6) family member with mental illness, representing six of six of the ten ACEs.  Although not included in the original ACEs Study, Mr. Blanco's injuries as a result of a motor vehicle accident at age 4; repeatedly moving schools (seven elementary schools and two middle schools before he dropped out after 8th grade – pg. 4); his significant truancy (p. 3) and withdrawal from school after grade 8, would also be considered extremely stressful or traumatic events occurring before age 18.  The presentence report also reveals that Mr. Blanco's extremely stressful or traumatic events before age 18 include: parents separated for a year due to his father's methamphetamine abuse and violence, truancy (his mother was ordered to serve two weeks in jail for his truancy); his brother (Lewis's) bipolar disorder and frequent assaults on Mr. Blanco from ages 10-15, his father's anger problems and Mr. Blanco's belief his parents should have disciplined he and siblings more.  *See* Exhibit 3, p. 5.

These traumatic events shaped Mr. Blanco's behavior without the benefit of any discipline, guidance, or mental health resources.  With early diagnosis and mental health

treatment, Mr. Blanco could have had an opportunity to address his multiple mental health conditions that influenced his actions in this case.

    c.   Neuroscience supports Mr. Blanco's potential, greatly diminishing any future danger to the community.

The brain has a remarkable ability to heal, to rewire for better thoughts, feelings and behaviors.   One of the many powerful findings of this new brain research is neuroplasticity – "the capacity of brain cells to change in response to intrinsic and extrinsic factors, can have negative or positive influence at any age across the entire lifespan."   In other words, the brain can be re-wired with positive, evidence-based interventions.  "Resilience is the result of a combination of protective factors.  Neither individual characteristics nor social environments alone are likely to ensure positive outcomes for children who experience prolonged periods of toxic stress. It is the interaction between biology and environment that builds a child's ability to cope with adversity and overcome threats to healthy development."  *See* Harvard University Center on the Developing Child, "Resilience," Developing Child, Harvard.edu, https://developingchild.harvard.edu/science/key-concepts/resilience/ (accessed December 13, 2020).

Framing this kind of positive rewiring in a brain changed by ACEs and toxic stress are four key messages:

1.  Children are not born bad.

2.  They have no control over what happened to them in childhood (i.e., ACEs).

3.  Whatever they did to cope was appropriate to survive the adversity(ies) they experienced as a child in the absence of protective factors/healthy alternatives for building resilience.

DEFENDANT'S SENTENCING MEMORANDUM - 15

4.   They can change/heal their brains and thus their physical and emotional health and quality of life.

*See Myths of the Science of ACEs*," ACEs Connection, October 1, 2019, https://www.acesconnection.com/blog/12-myths-of-the-science-of-aces (last accessed December 13, 2020).

Further, "there is growing evidence that treatment of sex offenders generally, and of pedophiles more specifically can be effective. Grossman, Martis & Fichtner (1999), for example, state that "some forms of treatment for sex offenders appear promising…What emerges from the literature is a strong suggestion that a comprehensive cognitive-behavioral program should involve components that reduce deviant arousal while increasing appropriate arousal and should include cognitive restructuring, social skills training, victim empathy awareness, and relapse prevention" (p. 358) citing, primarily, a meta-analysis by Hall (1995) which reflects a 30% remission rate for sex offenders. (It is important to note that these studies do not concern only child-related sex offenders, less so do they concern only child-related sex offenders with pedophilic disorder.)  Exhibit 3, p. 5; ¶ 3.

d.   Mr. Blanco's Static 99R score does not account for mental health treatment and rehabilitation.

Dr. Howsepian also conducted a Static 99R assessment, which yielded an "Above Average Risk.  *See* Exhibit 2, p. 6.  The Static-99R, revised in 2012, is a ten-item actuarial assessment instrument created by R. Karl Hanson, Ph.D. and David Thornton, Ph.D. for use with adult male sexual offenders who are at least 18 years of age at time of release to the community. http://www.static99.org (last visited September 22, 2021).  By definition, the relevance of this score is at the time of release, which in Mr. Blanco's case, will be many years away.  And as Dr. Howsepian noted,

DEFENDANT'S SENTENCING MEMORANDUM - 16

this 'Above Average Risk' takes into consideration only static (unchangeable) risk
factors and that various dynamic (or, changeable) factors might further decrease overall
risk. It is also important to note that these risk categories do not take into consideration
individual variables that might additionally decrease overall risk, including the adequate
treatment of co-occurring psychiatric conditions (some of which have never, until now,
been correctly diagnosed) that plausibly contributed to Jacob's index offenses (and which
have never been adequately treated), Jacob's undergoing intensive, protracted treatment
for Pedophilic Disorder, Jacob's high motivation for treatment, Jacob's degree of brain
plasticity, the absence of psychiatric conditions that might be expected to complicate
treatment (e.g., he has no history of Conduct Disorder and, therefore no history of or
current Antisocial Personality Disorder — an important factor in this context insofar as
antisociality in one with Pedophilic Disorder increases the risk of one's acting out
sexually with children, DSM-5, p. 699), Jacob's history of responsible employment,
Jacob's sexual attraction also to adults, Jacob's capacity for close social relationships,
Jacob's not having a legal history or a history of gang association or
affiliation, has never been expelled or suspended from school, has no relevant, recent
substance abuse history, has no non-substance-related psychiatric disturbances that would
significantly increase his risk of dangerousness, for example, psychotic disorder, bipolar
disorder, intermittent explosive disorder, Cluster B personality disorders, or a
neurocognitive disorder.

Exhibit  3, p. 6, ¶ 3; p. 7, ¶1.

> e.   Dr. Howsepian's evaluation provides a thorough outline of treatment
> recommendations.

Specifically, Dr. Howsepian opined that Mr. Blanco's high motivation for rehabilitation

is the most important factor in addressing his pedophilia and psychiatric comorbidities.  See

Exhibit 2, pp. 20-22.  Dr. Howsepian's supplemental opinion reiterated that appropriate

treatment could provide the "tools that [Mr. Blanco] will need in order both to dampen and to

manage his disordered sexual interests and impulses, to a degree that he would no longer pose a

significant danger to the community.  Exhibit 3, p. 8.

The Bureau of Prisons has facilities that provide the type of treatment that Mr. Blanco

requires to fully rehabilitate and Dr. Howsepian's diagnosis provides guidance for treatment of

his psychiatric disorders. Specifically, BOP offers:

1. Treatment programs that provide sexual offenders in Bureau institutions the opportunity to change behaviors, thereby reducing criminality and recidivism.

2. Specialized correctional management practices to address behavior that indicates increased risk for sexual offenses upon release.

3. Evaluation services to appraise risk of sexual offenses upon release and provide recommendations for effective reintegration into the community.

4. Transition services for sexual offenders releasing to the community.

*See* Bureau of Prisons, https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp (last visited April 12, 2021).

Thus, the BOP recognizes sexual offenders' ability to address their behavior and potential for rehabilitation by providing programs at multiple facilities designed to treat their disorders. As set forth above, given Mr. Blanco's youth, multiple now-diagnosed mental health disorders, his documented history of childhood adverse experiences and his sincere desire to confront and overcome the problems that led him on this path, he is an excellent candidate for rehabilitation. *See U.S. v. Carvajal*, 2005 WL 476125 (S.D.N.Y. Feb.22, 2005) (career offender range of 262 months too great; client will be 48 when he emerges from prison.) The goal of rehabilitation "cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind . . . A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. And these types of childhood traumas have been accounted for in justifying a sentencing variance. *See U.S. v. Walter*, 256 F.3d 891 (9th Cir. 2001) (combination of brutal beatings by defendant's father, the introduction to drugs and alcohol by his mother, and, most seriously, the sexual abuse defendant faced at the hands of his cousin, constituted the type of extraordinary circumstances justifying sentencing

DEFENDANT'S SENTENCING MEMORANDUM - 18

court's consideration of the psychological effects of childhood abuse and establish diminished capacity.)

Finally, as discussed in Dr. Howsepian's rebuttal of Dr. Napolitano's opinion (Exhibit 4, sealed), neither Dr. Howsepian nor the defense is arguing that Mr. Blanco's untreated mental health conditions caused his unlawful victimization of children.  This vast information of psychosocial and psychiatric analyses is before the court so that it may fully analyze Mr. Blanco's personal characteristics in fashioning a sentence that allows for his rehabilitation, considering the BOP's own recognition and provision of these resources and Mr. Blanco's vehement desire to rehabilitate.

2.   Lack of youthful guidance.

The PSR accurately reports Mr. Blanco's negligent upbringing due to parental failure to ensure that he attended school or received appropriate discipline and guidance.  PSR, p. 22, 136, 138.  Mr. Blanco was left to deal with his personality and psychiatric disorders on his own. This factor warrants a variance.

Aside from physical and emotional abuse and parental neglect of Mt. Blanco's mental health conditions, Mr. Blanco lamented that he had little adult guidance.  Specifically, he stated that his patents allowed him to do whatever he wanted, including quitting school.  During his probation interview, he wished his parents had disciplined him and done more to get him back into school.  PSR 23, ¶ 138

In *U.S. v. Swift*, 2008 WL 2906884 (N.D.Ind. 2008), the district court departed 10 months from the guideline range and imposed mandatory minimum, finding that defendant's lack of youthful guidance, and acceptance of responsibility indicated that the additional 10 months would serve no deterrent or retributive purpose to defendant or to the public.

DEFENDANT'S SENTENCING MEMORANDUM - 19

C.   The Requested Sentence is Within the Parameters Imposed in Similar Cases.

The requested 25-year sentence is well within the length of punishment imposed on

defendants convicted of similar facts and offenses.  *See U.S. v. Muzio*, 966 F.3d 61 (2nd Cir.

2020) (affirming 420-month sentence for child sexual exploitation and production of child

pornography as substantively reasonable, despite a combined guideline calculation of 6000

months, for a defendant in his 30s convicted of exploiting at least fourteen underage girls by

luring them into sending him a trove of sexually explicit pictures and videos of themselves).;

*U.S. v. Perez*, 1:18CR00211-001 (E.D. CA 2019) (imposing a total of 480 months for multiple

violations of 2251(a) and (e); 2422(b) and  2252(a)(2)); *U.S. v. Ronell*, 1:06CR00066-001 (E.D.

CA 2008) (imposing 198 Month sentence for one-count 2251(a) conviction).

CONCLUSION

Mr. Blanco is not excusing his behavior.  He acknowledged that his behavior was

unlawful in seeking treatment before his arrest.  He has accepted responsibility for his actions by

pleading guilty to all the counts in the indictment and is sincerely remorseful for the harm and

pain he caused his young victims and their families.  But Mr. Blanco must also be viewed in the

individualized context of his lived experience, replete with childhood trauma and neglect, as well

as unaddressed mental health disorders.  He respectfully requests that a sentence recognizes that

he is not inherently bad and that, with treatment and resources, he can overcome the urges that he

developed as a mechanism to deal with toxic stress of his childhood—actions and traumas that

he was ill equipped to prevent.  The recommended sentence solely focuses on punishment and is

more severe than necessary to protect the community, especially given Mr. Blanco's high

motivation and potential for rehabilitation.

DEFENDANT'S SENTENCING MEMORANDUM - 20

The court should not throw Mr. Blanco away.  The requested sentencing variance to 300 months will give him hope and opportunity for redemption by accepting his punishment, undergoing treatment, and yes, giving him a chance to eventually live custody free to show that he was worthy of that chance.

                                        Respectfully Submitted,

DATED:  September 24, 2021        /s/ Virna L. Santos_____
                                        VIRNA L. SANTOS
                                        Attorney for Defendant
                                        Jacob Eric Blanco

DEFENDANT'S SENTENCING MEMORANDUM - 21