PHILLIP A. TALBERT
Acting United States Attorney
DAVID GAPPA
Assistant United States Attorney
United States Attorney's Office
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000

NADIA C. PRINZ
Trial Attorney
U.S. Dept. of Justice, Criminal Division
Child Exploitation and Obscenity Section
1400 New York Avenue NW, Suite 600
Washington, DC 20005
Telephone: (202) 514-3740

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO.  1:17-CR-00140 DAD-BAM |
|---|---|
| Plaintiff, | |
| v. | UNITED STATES' SENTENCING MEMORANDUM |
| JACOB BLANCO, | |
| Defendant. | |

## I.      INTRODUCTION

The United States of America, by and through its attorneys, PHILLIP A. TALBERT, Acting United States Attorney for the Eastern District of California, DAVID L. GAPPA Assistant United States Attorney, and NADIA PRINZ, Trial Attorney, files this sentencing memorandum to aid the court in understanding this case and to arrive at the most appropriate sentence.  The government is also submitting several exhibits, some appropriate for sealing, for review by the court prior to the sentencing hearing.  That material has been made available to defense counsel, and it previously has been available through the discovery process.

The government recommends a sentence that includes the following components:  a within-U.S. Sentencing Guidelines (USSG) range prison term, penalty and special assessments, and restitution. These sentencing recommendations are fully justified by an analysis and application of the factors set forth in 18 U.S.C. § 3553(a), as well as the relevant USSG, and they are necessary to provide just punishment, protection of the public, and adequate deterrence for the defendant's serious offense conduct.

## II.   BRIEF PROCEDURAL HISTORY OF THIS CASE

The government charged Blanco by way of a criminal complaint filed on May 22, 2017, shortly after law enforcement in New York learned that he had sexually exploited a six-year-old girl using the social media application Musical.ly.[1]   Docket Entry 1.   A grand jury returned a six-count indictment with a forfeiture allegation on June 1, 2017.  Docket Entry 9.  A grand jury returned a superseding indictment, also with six counts and a forfeiture allegation, on January 24, 2019.  Docket Entry 43.

Blanco has, at different times, represented himself and been represented by two different attorneys.  Docket Entries 14, 20, 52.  He filed a pro se motion to suppress evidence seized under authority of a search warrant, and the court denied that motion.  Docket Entries 45, 48, 52.

The court ordered that Blanco be examined for mental competence, and after the court considered reports from two different doctors, the court found that Blanco was competent to proceed with a trial.  Docket Entries 64-73.

Although the case had been set for a jury trial on different dates in 2019 and 2020, Blanco pleaded guilty on May 15, 2020, to all charges in the superseding indictment and admitted the forfeiture allegation.  More specifically, he pleaded guilty to five counts of sexual exploitation of a minor in violation of 18 U.S.C. § 2251(a) and one count of distribution of visual depictions of a minor engaged in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(2).  Docket Items 27, 73, 85, 90.  The range of imprisonment for each of the five sexual exploitation of a minor counts is 15-30 years, and it is

---

[1] As noted in the Presentence Investigation Report (PSR) at 6 n.1, Musical.ly was a social media application based in China which permitted users to create and share lip-sync music videos ranging from 15 seconds to one minute.  The Chinese company ByteDance purchased Musical.ly in November 2017, and merged it into its TikTok application in August 2018.  During the time span that Blanco committed his offenses using Musical.ly the application was extremely popular with user accounts increasing from approximately 90 million to over 200 million.

5-20 years for the child pornography trafficking offense, for a total sentencing range of 15-170 years imprisonment.   PSR at page 31.   The plea agreement permits Blanco to appeal the denial of his motion to suppress evidence, but not his sentence.   Docket Item 85.

### III.        CALCULATION OF THE U.S. SENTENCING GUIDELINES RANGE

The government agrees with the probation office calculation of the sentencing range under the USSG.  (PSR at ¶ 56-122). The government concurs with the probation office assessment that, because Blanco's offense conduct involved the exploitation of more than one minor, Chapter Three Part D shall be applied as if the exploitation of each victim had been contained in a separate count of conviction. USSG § 2G2.1(d)(1); PSR at ¶56.  Blanco should receive three additional levels based on the units assigned for a multiple count adjustment. PSR at ¶ 114.  He also should receive an additional five-level enhancement under USSG §4B1.5(b)(1), because he engaged in a pattern of prohibited sexual conduct with minors.  PSR at ¶ 118.  After an adjustment for his acceptance of responsibility, the total offense level is 52, which is then treated as a level 43, under USSG Chapter 5, Part A (comment n.2). [2]  PSR at ¶ 119-120. With a criminal history category of I, Blanco's USSG range for imprisonment is limited by statute to 2040 months (170 years). PSR at ¶ 161.

As discussed below, neither a downward departure nor a variance is warranted in this case, despite the defendant's arguments for mitigation.  A sentence within the USSG range is appropriate based on the seriousness of the offense conduct, the large number of victims, and the danger he will continue to pose to minors, especially prepubescent females.  It is also necessary to account for all of the sentencing considerations identified in policy statements from the U.S. Sentencing Commission and Congress including protection of the public, deterrence, and the need to avoid unwarranted disparities with other sentences for similar offense conduct.

///

///

///

---

[2] The PSR, in its Justification at page 32, references the total offense level as 47, not 52, which is incorrect based on the calculations set forth in the previous section.  But since the Guideline Sentencing Table has a maximum offense level of 43, the final guideline range calculation is correct regardless of this apparent calculation error.

## IV.   RELEVANT SENTENCING FACTORS SUPPORT THE SENTENCE RECOMMENDED BY THE GOVERNMENT

Under 18 U.S.C. § 3553(a), when imposing a sentence, the court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to

(A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) afford adequate deterrence to criminal conduct;

(C) protect the public from future crimes of the defendant; and

(D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the Sentencing Guidelines; and

(5) any pertinent policy statement by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

 (7) the need to provide restitution to any victims of the offense.

Careful consideration and application of these factors justifies a within-Guidelines sentence.

### A.   3553(a)(1) – The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.

#### 1.   The Nature and Circumstances of the Offense Reveal that Blanco was a Dangerous and Cruel Offender Who Will Always Put Children at Risk of Harm

Blanco's extensive criminal conduct was extremely serious and demands an appropriately stringent sentence.  Blanco has been a serial predator, exploiting vulnerable minors as young as four and six years old.  Had his serial online predation not been stopped due to his arrest, it is highly likely that

his victims would now number in the hundreds.  Blanco admitted to defense expert Dr. Avak Howsepian that he has a sexual attraction to minors, but he did not understand why he had the attraction.  He admitted that he masturbated while viewing images of children being sexually exploited.  He admitted that he engaged in deceptive and coercive behavior, posing as other people such as a female talent scout for a modeling agency, in order to convince young girls to create and transmit to him images of themselves engaged in sexually explicit conduct.  When asked why he did this, he stated: "I don't really know.  I can't talk to anyone.  It was a way to talk to someone."  Howsepian Report dated June 11, 2019 (June Howsepian report) at 2 (last paragraph).  Some of the more disturbing admissions included that Blanco never had a strategy to avoid continuing to engage in his illegal conduct, and he had been doing it for so long that he did not believe that he would be caught.

The defendant initially came to the attention of law enforcement agents on April 3, 2017, when the parents of Minor Victim 1 (MV1) discovered that their daughter had been communicating with an online offender who had requested sexually explicit images of her, including nude and lascivious depictions of her genitals. The parents initially reported their shocking discovery to the Nassau County, New York Police Department.[3] The parents reported that MV1, who was then only six years old, had been using the Musical.ly app on an iPad when she had been contacted by a Musical.ly user with the username "@summerme001."  They reported that @summerme001 asked MV1 to send images of her buttocks and vagina.  After a forensic examination of the iPad that MV1 had been using, local investigators were able to extract and view the messages and images exchanged between MV1 and @summerme001. This message exchange occurred over the course of several days, from March 27 to March 31, 2017.  In these chats, @summerme001 asked MV1 how old she was and MV1 answered that she was "7" years old.  The chat extractions confirmed that @summerme001 had requested and received sexually explicit images from MV1.  Additionally, the user instructed MV1 on how to pose and how to

---

[3] The court will find an impact statement from MV1's mother at Docket Entry 101-1 (page 1 of 19). She wrote on July 14, 2020, that Blanco's conduct "has been life changing and traumatizing for me and my family."  She added, that "I still feel I look at my daughter differently as sometimes I get the visuals of the horrible things you asked her to do or, show.  You have broken so many homes . . . I will never forget that heart shattering feeling I felt 3 years ago discovering what I found on that Ipad, knowing that someone was able to get inside my little girls heart and mind like that.  What you have done to her and all the other children involved is disgusting and you don't deserve to have your freedom if this is what you do with it."

manipulate her vagina in the photographs. The chats also showed that @summerme001 had asked MV1 to have her dog lick her genitals.   Further investigation revealed that the internet protocol (IP) address associated with the @summerm001 account resolved back to Comcast Cable Communications and an account in Fresno, California.

On April 21, 2017, Comcast responded to a subpoena stating the IP address in question was associated with a service address at 369 W Lexington #204, Fresno CA.  An additional email address of Jacob_blanco@comcast.net was also used for the account.  Based on the information in the return, Detective Wilkin of the Fresno Police Department, along with assistance from Homeland Security Investigations (HSI) Special Agent (SA) Timothy Kotman, began an investigation into the 369 W Lexington residence.  They determined that Jacob Blanco was one of two men residing there.  After additional investigation into both residents, on May 5, 2017, Detective Wilkin and Special Agent Kotman went to Blanco's place of employment.  The law enforcement agents seized Blanco's cellphone and asked to speak with him.  In the course of this interview, Blanco confessed to enticing approximately fifty minors to send nude images and/or videos of themselves via Musical.ly using both his phone and his computer.[4] He also admitted he recognized the victim from New York and admitted he had directed her to send him nude photographs. Blanco confessed that @summerme001 was his username on Musical.ly and that when his account would get shut down (for violating terms of service) he would create another account using a variation of that name. Blanco also stated there was an encrypted folder on his desktop computer in his room. He provided the passcode for this folder. Blanco also admitted that there would be a large amount of child pornography on his computer.

After Blanco's devices were seized under authority of a search warrant, law enforcement agents conducted forensic examinations of multiple electronic devices. Based on a forensic examination of hard drives taken from Blanco's residence, it appeared that Blanco had solicited nude images from Minor

---

[4] One of the government's sentencing attachments shows a file structure from one of Blanco's computer hard drives that reveals how methodical Blanco was in acquiring and organizing material.  For example, he used different applications to search for and communicate with numerous victims.  He usually recorded his activities with a separate recording application on his phone and often connected his phone to his computer so that he could multitask and have access to more programs and images.  After placing material into a folder that needed to be sorted, he then created folders for each victim and labeled them using their age and screen name.

6

Victim 2 (MV2) and saved those images to his computer hard drive on dates between January and March of 2017.  The images of MV2 included focused, close-up shots of her nude vagina and genital area, as well images of MV2 in various states of undress. Her face is visible in some, but not all, of the images. Agents were able to glean sufficient information from the images depicting MV2 to identify her as an 11-year-old living in Longview, Washington.

Detective Wilkin contacted the Longview Police Department and requested its assistance. Detective Lozano spoke with MV2 over the course of three interviews. Through these interviews with MV2, local detectives learned the identity of Minor Victim 3 (MV3), a 10-year-old who was depicted with MV2 in some of the recovered images.  Investigators were able to interview the victims. Investigators learned that Blanco had communicated with MV2 and MV3 under the username "Maya.XOXO." MV3 indicated that a user she had communicated with online purported to be a model, and that MV2 and MV3 had modeled clothes for this user. She thought the "model" account was Maya.XOXO, and that Maya.XOXO had also requested inappropriate images of MV3. However, no images of MV3 engaged in sexually explicit conduct have been identified on the defendant's devices at this time.

Several other videos discovered on Blanco's devices depicted a minor female (MV4), appearing to be approximately 11 years old, posing and acting in self-produced videos as directed by Blanco. A younger minor male victim (MV5) can also be seen in the videos.  The videos appear to be recordings of live streaming video chat. One such video was entitled "[Redacted name] 11 sucks Bro-1.m4v.mpg".  In this video, Blanco directed the minor female to suck the minor male's penis, which she did. Blanco also told the minor female, "I wanna see him lick you" to which she responded "he [wouldn't]…lick so he fingered me," followed by a video clip in which the minor female minor inserts the minor male's finger into her vagina. The videos of MV4 and MV5 appear to have been saved to a hard drive on Blanco's computer on dates between June of 2016 through March of 2017.  Investigators determined that these victims resided near Houston, Texas, so HSI agents there were asked to confirm the identity of the victims and coordinate child forensic interviews.  On January 8, 2019, HSI Houston special agents met with the parents of MV4 and MV5 at their residence in Spring, Texas. The parents confirmed the

1  identity of their children and the location of the recorded activity as the bedroom of their daughter, MV

2  4.  MV 5 would have been about 4 years old in June of 2016 and MV 5 would have been 11.[5]

3      During this interaction with MV4, he directed her to insert a Sharpie-style marker into her

4  vagina, and when he saw her then four-year-old brother in the background, he encouraged her to molest

5  her brother.  He said things such as "I have an idea :) Have him spread ur cheeks for u".  When, at

6  Blanco's direction, she sent Blanco a video of herself masturbating her younger brother's penis, Blanco

7  responded: "omg that's so hot Please do that on live video ;) sooo hot . . . Suck on it"  When Blanco

8  viewed a video of that activity, he told MV4 "Suck it more" and "Would you see if he will lick you?"

9  Never quite satisfied, Blanco told MV4 "Nice . . . One more, You sucked his dick but will you suck his

10 balls too?  Balls and dick in the same video.  And at the end of the video ask him if he likes it."  MV4

11 complied by sending a video which started with her wrapping her mouth and tongue around MV5's

12 penis and testicles.  At one point MV4 said she would not engage in additional requested action, because

13 her brother had just turned four years of age.

14

15

16

17

| | | |
|---|---|---|
| M_  Pt2-20.m4v | 1075 | m4v |
| Mr    11 Sucks Bro-1.m4v | 1053 | m4v |
| M_  11-1.m4v | 1057 | m4v |
| M_  11 Sucks Bro-9.m4v | 1085 | m4v |
| Mr  Everything-10.m4v | 1084 | m4v |

18 As seen in the screen capture above, Blanco recorded the exploitation of MV4 and MV5, as he did with

19 most victims, and then he edited the material and gave it specific titles.

20      A review of Blanco's seized electronic devices also revealed videos of Minor Victim 6 (MV6)

21 which appear to have been recorded in July of 2016 and which Blanco saved to his hard drive in

22 September of 2016.  On May 24, 2017, SA Kotman contacted the Port Clinton (Ohio) Police

23 Department. SA Kotman had linked the Music.ly account used by MV6 to an email account in one of

24 her parent's names.  In addition, an IP address associated with the account came back to Port Clinton.

25 MV6, who was then 10 years old, participated in a forensic interview and admitted she had sent nude

26

27      [5]  The factual basis in the plea agreement refers to MV4 as being 12 years old at the time of the
   offense conduct. As indicated in the PSR, subsequent verification of MV4's date of birth establishes that she

28  would have been 11 years old at the time Blanco first began saving videos of her to his hard drives. PSR at
   ¶¶ 24-28.

images to someone named "Tyler" from California. Videos recovered from Blanco's devices depicted MV6 live-streaming herself in a bathtub and in a bedroom, while chatting with "Tyler." In the course of these videos, the minor exposes her genitals at Blanco's direction, posing herself and adjusting the phone camera she is using according to his instructions.

Investigators discovered still and video images of many additional victims, including MV7. Images of MV7 included close up shots of MV7's nude pubic area, exposed as the central focus of the image. There were also images and one video in which the minor appears to be using the toilet. Blanco had saved these images to one of his hard drives on or about June 28, 2016.  On Thursday, May 25, 2017, SA Kotman forwarded information related to the investigation, including the email address and username of MV7, as well as sanitized images of the victim to the Rhode Island Internet Crimes against Children Task Force.  Local detectives interviewed MV7's parents, and her mother positively identified the photograph of her daughter that was located on Blanco's digital media.  MV7 was 11 years old at the time she was identified. Her father also indicated that the previous summer, he had taken MV7's tablet away because he had discovered she was communicating with an unknown man on Musical.ly.

Fresno investigators also eventually learned of an independent investigation that had been conducted in Mississippi.  More specifically, in April of 2017, Mississippi law enforcement investigators received a report of a nine-year-old girl who had received requests to take nude photos using the app Musical.ly.  The minor's mother reported that her daughter had been receiving vulgar messages from the user "Summerme001" using the messaging functionality of the app Musical.ly. Summerme001 told the complainant's daughter that she was also nine years old and her mom was a model coach.  Summerme001 convinced the minor victim in Mississippi to take pictures of herself and send them to Summerme001 to advance the victim's hopes of being a model. After the minor sent a few non-nude pictures, Summerme001 asked the minor for nude photos. The minor refused to send nude photos and ultimately informed her mother of the request.  A grand jury subpoena to Musical.ly for records regarding the identification of the creator/user of the Summerme001 account led the investigators back to Valley Pacific Builders in Fresno, where Blanco had been employed. Because the

1   address resolved to Fresno, Mississippi investigators contacted the Central California ICAC team, and

2   learned that Blanco had already been arrested for similar offenses.[6]

3       Blanco used other social media applications in additional to Musical.ly.  For instance, he used

4   Kik Messenger which permits users to send text messages and exchange still and video images.  When

5   investigators examined one of Blanco's cellphones, they discovered a conversation from November of

6   2016.  Blanco had communicated with an apparent minor to whom he sent image of child pornography

7   in the context of a conversation in which he also directed the minor to engage in masturbation.  Blanco

8   also solicited images of the minor engaged in masturbation. This minor has not been identified, however

9   this conduct, to which the defendant has admitted, is the basis for the receipt and distribution count

10  (Count Six).

11      Review of his communications with additional minors further revealed that Blanco directed, as

12  well as sometimes extorted or threatened, minors to create and send him child pornography.  Blanco

13  often pretended to be a female minor or to be related to a modeling agent in order to entice minors to

14  create and send him sexually explicit depictions. His recorded communications show that Blanco used

15  multiple applications, including Kik, Musical.ly (now TikTok), and Snapchat, all of which were popular

16  with minors, to troll for his victims incessantly.  His hard drives showed that he contacted or attempted

17  to contact many more minors than he was able to persuade to create and send him images. As a whole,

18  therefore, the extensive evidence of Blanco's offense conduct demonstrates that he habitually victimized

19  as many minors as he could during the course of several years.

20      In fashioning the sentence, the court should consider the number of victims and the impact of

21  Blanco's actions on his many minor victims.  The "use of children as subjects of pornographic materials

22  is harmful to the physiological, emotional, and mental health of the child" used in the production of such

---

[6] Although the nine-year-old victim did not send explicit images to Blanco, as he had requested, her limited interactions with Blanco had very traumatic impacts on her, some of which apparently still linger.  As noted in her mother's impact statement, at Docket Entry 101-1 (page 9), the experience caused the victim to feel "scared" and "untrusting," and to experience "anxiety/nervous"ness, "nightmares/lack of sleep," "fear of male figures," and "resurfaced feelings for missing her daddy (feeling safe)" since he had been killed serving as a law enforcement officer approximately two years earlier.  The mother also reported, among other adverse effects, that her daughter feared that Blanco would: "come to her house and get her (per the evidence of his threats in that conversation)"; "show her pictures to her friends (per the evidence of his threats in the conversation)"; and "come to her school and tell on her (per the evidence of his threats in the conversation)".

10

material.  *Osborne v. Ohio*, 495 U.S. 103, 109 (1990); *see also New York v. Ferber*, 458 U.S. 747, 758 n.

10 (1982) ("[P]ornography poses an even greater threat to the child victim than does sexual abuse or

prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in

future years, long after the original misdeed took place. A child who has posed for a camera must go

through life knowing that the recording is circulating within the mass distribution system for child

pornography.") citing Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake

Forest L.Rev. 535, 545 (1981).); *see also* Shanta R. Dube et al., *Long-Term Consequences of Childhood

Sexual Abuse by Gender of Victim*, 28(5) Am J Prev Med, 430 (2005) ("studies examining the long-term

effects of childhood abuse and related stressors have found increased risk for outcomes such as

substance use and misuse, psychiatric disorders, suicide, and numerous other health and social

problems").  The long-term effects of such abuse bear upon the need for just punishment. The impact of

the defendant's conduct on the victims is therefore undoubtedly significant and the number of victims

directly impacted by Blanco sets him apart from many other offenders charged with the sexual

exploitation of a minor.

The defendant's offense conduct reveals that he is an extreme risk to minors.  Even his own

sentencing submission acknowledges that he has been diagnosed with pedophilic disorder.  The report

dated June 11, 2019, (at pages 21-22) notes that "the goal of *completely* eliminating pedophilic interests

and impulses in someone with Pedophilic Disorder is, in almost all cases, unrealistic" (emphasis in

original).  The government agrees that the defendant is highly likely to always have a sexual interest in

minors, particularly girls, and will always present a danger to them.  A within-Guidelines sentence of

imprisonment is necessary to adequately reflect the nature of the defendant's serious crimes.

## 2.  Blanco's History and Characteristics Also Demonstrate his Dangerousness

Even though Blanco has no prior criminal convictions, his history and characteristics weigh in

favor of a very significant sentence.  The defendant's offense conduct marks him as a consistent and

determined predator.  Moreover, the psychiatric evaluation of the defendant by Dr. Howesepian, dated

June 11, 2019, (June Howsepian report) establishes several concerning characteristics of the defendant,

specifically that he suffers from Pedophilic Disorder, Obsessive-Compulsive Personality Disorder, and

that he has a past history suggestive of Oppositional Defiant Disorder.

1    Though Dr. Howsepians's evaluation indicates that, in his opinion, treatment might provide

2 Blanco with the tools to "dampen and manage his disordered sexual interests," it is significant that

3 Blanco has not yet received any such treatment, and thus he stands before the court for sentencing

4 without the benefit of any of these tools.  June Howsepian Report at 21.  Notably, Blanco's alleged

5 interest in treatment is not corroborated by any specific action.  Although it is certainly less convenient

6 to engage in counseling or treatment while in custody, there is no indication that Blanco has made any

7 effort during the past four years to begin that process.  During that time he has worked with attorneys in

8 defense of his case, represented himself in filing motions, and helped an expert prepare arguments to

9 mitigate his sentence.  Nor is there any corroboration of any significant counseling or treatment to

10 address his disorders prior to being detained.  Thus, his diagnosed disorders cannot be considered to

11 have improved.  Any potential positive response to treatment is outweighed by the fact that the

12 defendant has a current and well-established sexual attraction to children, significant intimacy deficits,

13 issues with impulse control, and compulsive behavior patterns.  As Dr. Susan Napolitano discussed in

14 her report, "predatory offending by its nature is more dangerous to the community."  Report dated

15 September 2, 2021, from Dr. Susan Napolitano (Napolitano Report) at 13 (Risk Assessment).

16    Blanco also points to his own history of abuse as well as a "lack of youthful guidance" as

17 mitigation for his offense conduct. (Defendant's Informal Objections to PSR at 3.)  But he has not

18 pointed to any specific ways in which a lack of supervision, guidance or care has contributed to the

19 offense conduct, other than to state that "toxic stress" had an effect in shaping his brain function.  As Dr.

20 Napolitano aptly noted in her report, although many of the defendant's "past environmental factors

21 warrant sympathy, I do not see how they are causally related to his criminal sexual conduct.

22 Additionally, there is no scientific basis for concluding that Mr. Blanco's (non-paraphilic) mental

23 disorders are causally connected to his offense behavior."  Napolitano Report at 11 (Opinion).  More

24 specifically, although "Blanco's shyness, poor sense of self, anxiety, poor social skills, rigidity, young

25 adult brain, adverse childhood experiences and fear of speaking as a child may help us better understand

26 him as a person, these aspects did not cause him to sexually prey upon up to 50 young children across

27 the country."  Napolitano Report at 11 (Opinion).  Dr. Napolitano noted that most "people with these

28 problems or poor environmental factors do not go on to sexually abuse children."  And "[i]nterestingly,

1   his criminal conduct reveals little evidence of anxiety, shyness, perfectionism or poor social skills.  The

2   fact that none of these traits were evident in his offending should not be used to justify that his offending

3   was caused by a desire to overcome these traits."  Napolitano Report at 12 (Opinion).  Despite suffering

4   from selective mutism as a child, the defendant was able to communicate effectively with more than

5   fifty (50) minor victims. He was able to successfully entice, persuade, coerce, and threaten minors of

6   various ages into doing his bidding.

7          And as a self-reported victim of sexual assault himself, he better than most would, or should,

8   have been able to understand the traumatic impact that such abuse would have on his minor victims.

9   Despite that knowledge, he was unable to conform his conduct to the law.  Only after charges were

10  pending in this case did Blanco report, through his mother, that he was the victim of sexual abuse as a

11  child.  It is a common excuse among those accused of child sex crimes to claim that they were sexually

12  abused as a child.  Accepting Blanco's statements as true, however, works in favor of the court

13  following the government's recommended sentence, since it would mean that Blanco acted with a lack

14  of empathy for his many victims.  It does not require an M.D. or a Ph.D. to conclude that a person who

15  experiences a traumatic event is more likely to empathize with another person who experiences similar

16  trauma.  Experiencing a hurricane in New Orleans makes one naturally more empathetic to the plight of

17  those suffering an impending hurricane in Texas or elsewhere.  Living through a tornado in Texas makes

18  one more empathetic towards people living in Kansas. Experiencing an earthquake while on vacation in

19  Las Vegas makes one naturally more empathetic to the tremors experienced by those in southern

20  California.  The same common sense logic applies to those who suffer sexual abuse of any kind, whether

21  childhood sexual abuse or rape as an adult.  Those individuals will naturally be more empathetic towards

22  someone who has experienced the same type of sexual abuse.  The research on empathy supports this

23  common sense analysis.  "Theoretically, the closer that one's own personal victimization experience

24  matches a victim's condition (i.e., relationship context), the more one should identify with that

25

26

27

28

1  situation."[7]   Indeed, "those who have experienced some type of sexual victimization report more

2  empathy than those without such experience."[8]

3          In a study published in 2016, researchers conducted qualitative research on male victims of

4  sexual abuse, inquiring why they had not perpetuated the abuse on others.  "By far, the most commonly

5  cited reason the participants gave for having not sexually offended was experiencing empathy for other

6  people and having no desire to hurt others."[9]  When asked to explain, participants in the study made

7  statements such as, "Experiencing pain is like putting your hand in the fire. You don't have to tell

8  anyone twice that they are experiencing pain.  I wouldn't want to stick someone else's hand in the fire . .

9  . I'm aware of the pain and emotions that an abused person would go through and I don't want to put

10  anyone else through that."[10]  The study's authors observed that "[s]uch evidence is unique as it directly

11  contradicts the victim–offender cycle hypothesis because it demonstrates that not all victims become

12  offenders and, in fact, the victimizing experience contributed to their status as a nonoffender."[11]  In other

13  words, instead of making them *more* likely to offend against a child, being a victim of sexual abuse

14  actually makes them *less* likely to offend because the natural empathy developed from such experiences

15  deters such perpetuating behavior.  "This, coupled with the knowledge that the majority of victims do

16  not become sexual offenders (Salter et al., 2003), adds substantially to the argument that the pathway

17  from victim to offender is not as direct as the literature would have us believe."[12]  And studies have

18  shown that "not all victims of childhood sexual abuse go on to sexually abuse others.  In fact, the

19  majority of victims do not go on to perpetuate the abuse."[13]  "Furthermore, not all sexual offenders have

20

21

---

22  [7] Osman SL. (2014). Participant Sexual Victimization by an Acquaintance and Gender Predicting
Empathy with an Acquaintance or Stranger Rape Victim. Journal of Social and Clinical Psychology,
23  Vol. 33, No. 8, 2014, pp. 732-742.

24  [8] Osman SL. (2011). Predicting rape empathy based on victim, perpetrator, and participant
gender, and history of sexual aggression. Sex Roles 64, 506–515.

25  [9] *Id*.

26  [10] *Id*.

    [11] *Id*.

27  [12] *Id*.

28  [13] *Id*. (citing Jespersen et al., 2009; Thomas & Fremouw, 2009; Widom & Ames, 1994; Salter et
al., 2003).

a history of sexual abuse. Thus, 'sexual abuse history is neither a sufficient nor a necessary condition for adult sexual offending.'"[14]

Blanco's claims should also be viewed with skepticism because research has consistently shown that such self-reports by those accused of sexual offending are inherently unreliable in a statistically significant way.  In 2001, a series of studies from 1978 through 1994 were examined in an article published in Federal Probation. The article explained that the three different studies showed remarkable consistency such that the following conclusions could be summarized as follows:

1. Adults will lie and understate by a factor of five to six the number of sexual crimes they have committed.

2. Adults will lie and under report their history as a juvenile sex offender.

3. Adults will lie and **<u>over</u>** report their history of childhood sexual victimization.

4. With polygraphs, they disclose six times as many victims and most confess that they were sexually offending as juveniles.

Hindman, J. & Peters, J.M. (2001), *Polygraph testing leads to better understanding adult and juvenile sex offenders*, Federal Probation, 65(3), 8–15.  One chart puts the evidence in stark relief:

TABLE F

*Comparing the Histories of Adult Offenders Before and After Polygraph 1994–1999*

|  | Pre-Polygraph | Post-Polygraph |
|---|---|---|
| Average number of victims reported | 2.9 | 11.6 |
| Percent reporting being sexually abused as a child | 61% | 30% |
| Percent reporting sexually abusing others as a child | 27% | 76% |

As the chart makes clear in the second row, before taking a polygraph, 61% claimed to have been sexually abused as a child.  But that number fell by half to 30% when the polygraph examination was administered.  In other words, more than half of the defendants who claimed to have been sexually abused had lied.  The article's authors summarized the situation thus: "Today, just as in 1978, adult

[14] *Id*. (quoting Jespersen et al., 2009, p. 190).

15

offenders not polygraphed are very likely to minimize the history of their abusive behavior and to overstate their own histories of victimization." *Id*.

Even if there were a correlation between being a victim of child molestation and Blanco's later engaging in serial, sexually exploitative conduct on children—which is not supported by logic or science—correlation is not causation. While this "correlation" may appear attractive as an explanation for inexplicable conduct, reality does not bear it out. If being sexually abused makes one more likely to offend in a like manner, why don't girls, who make up a disproportionately larger percentage of child exploitation victims, make up an equally large percentage of child exploitation offenders? In other words, if abuse begets abuse, then the large volume of female victims would result in a demonstrably larger volume of female offenders. Statistics do not bear this out. Indeed, this court's own experience likely is instructive: How many female offenders has this court sentenced as compared to males?

Research in this area further illustrates that Blanco's suggestion—being abused caused him to abuse—is scientifically unsupported. "The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend. However, there are serious limitations to this explanation."[15] As one journal article explained it, "sexual abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations."[16] Indeed, "the data do not provide strong support for a cycle of sexual abuse encompassing a substantial proportion of male perpetrators."[17]

With respect to studies which have suggested that "prior victimization may have some effect in a minority of perpetrators . . . [a]nother possibility is that some sexual perpetrators may feign sexual victimization in order to gain sympathy, preferential treatment, or therapy."[18] "There is also legitimate concern regarding the validity of many of the self-reports of pedophiles who claim to have been abused

---

[15] Lambie, Ian, et al*., Resiliency in the victim-offender cycle in male sexual abuse*, Sex Abuse: A Journal of Research and Treatment 14(1), 43 (2002).

[16] Briggs, F. and R. Hawkins, *A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders*, Child Abuse & Neglect 20(3), 230 (1996).

[17] Glasser, M. et al., *Cycle of child sexual abuse: links between being a victim and becoming a perpetrator*, The British Journal of Psychiatry 179, 488 (2001).

[18] Id.

as children themselves.  These statements are often made in a legal or group treatment setting, in which pedophiles may be trying to mitigate their sentence or gain sympathy for their behavior."[19]  In fact, "[s]tudies into prevalence of childhood sexual abuse among sex offenders have produced mixed results with 8% to 60% of child molesters reporting having been sexually abused as a child.  Variability in prevalence rates across studies may be due in part to differing motivations on the part of subjects to give self-serving histories."[20] Additionally, "[p]erpetrators may lie about their actions or attempt to excuse their behavior by pointing to their own victimization as children."[21]  Moreover, "[e]xcuse-making may be more prevalent in settings where such behavior may be useful, such as in the early stages of therapy (before learning that excuse-making is not acceptable) or during the trial process (perhaps under the guidance of enthusiastic defense lawyers)."[22]  Indeed, as explained above, "when verified by polygraph . . . the percentage of offenders who experienced sexual victimization in their own lives drops significantly."[23]

**B.  3553(a)(2) – The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with necessary educational training, medical care, or other correctional treatment.**

**1.  Blanco's Sentence Must Reflect the Seriousness of Victimizing Dozens of Children, Promote Respect for the Law, and Be Just Punishment**

Unless the court imposes a sufficiently severe sentence, there is a risk that the sentence could perceived as minimizing crimes in which the sexual abuse takes place through the internet rather than through physical contact.  Many victims have indicated that as bad as suffering a contact sexual offense has been, they at least felt some sense of relief, safety, and security once law enforcement intervened and arrested the perpetrator.  But many victims have indicated that their trauma is worse when they

---

[19] Hall, R.C.W., *A Profile of Pedophilia: Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues,* Mayo Clinic Proceedings 82(4), 464 (2007).

[20] Haywood, Thomas et al., *Cycle of Abuse and Psychopathology in Cleric and Noncleric Molesters of Children and Adolescents,* Child Abuse & Neglect 20(12) 1234, (1996.

[21] Briggs, F. and R. Hawkins, *A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders*, Child Abuse & Neglect 20(3), 232 (1996).

[22] *Id*.

[23] Hindman, Jan et al., *Shedding Light on the Histories of Sex Offenders Using Clinical Polygraphy,* The Sexual Predator (vol. IV), 20-5 (2010); *see also* Hindman, Jan et al., *Polygraph Testing Leads to Better Understanding Adult and Juvenile Sex Offenders*, Federal Probation 65(3), 8 (2001).

realize that someone captured their sexual abuse by recording it, repeatedly consuming it, and making it

available to others.  And the magnitude of the harm done must be multiplied by large number of victims,

not all of whom have even been identified.  For example, for as diligent as law enforcement

investigators across the United States worked to identify victims, there are many victims in this country

and in other countries that, for different reasons, have not been identified.[24]   Of course, their trauma

and suffering is no less significant.  The sentence in this case must take into account the vast damage

that has been inflicted on a large number of young people, some of whom will no doubt suffer lingering

effects for years to come.  It would likely seem unfathomable to most people that a defendant, regardless

of age, would be considered for release from prison if that person had physically molested the number of

victims that Blanco has victimized.  This is especially true given that Blanco methodically sought out

young victims usually in the range of ages between six and twelve.  Reading the impact statements from

mothers whose daughters were victimized by Blanco highlights the destructive impact that Blanco's

crimes have had on his young victims.

### 2.   Blanco's Sentence Must Deter Criminal Conduct by Him and Others

The defendant's sentence should both deter him from engaging in future criminal conduct and

also protect the public.  If given the opportunity, there is a strong likelihood that the defendant would

engage in similar behaviors in the future, due to his sexual attraction to children, his intimacy deficits,

his technical savviness, and his compulsive nature.  Apart from Dr. Howsepian's most significant

diagnosis of the defendant, i.e. that he suffers from Pedophilic Disorder, his offense conduct clearly

demonstrates that Blanco is sexually attracted to children.  *See* James M. Cantor and Michael C. Seto,

*Child Pornography Offenses Are a Valid Diagnostic Indicator of Pedophilia*, J Abnorm. Psychol.,

115(3):610-5 (2006) ("Child pornography offending is a valid diagnostic indicator of pedophilia.  Child

pornography offenders were significantly more likely to show a pedophilic pattern of sexual arousal

during phallometric testing than were comparison groups of offenders against adults or general sexology

patients.  In fact, child pornography offenders, regardless of whether they had a history of sexual

---

[24] As noted, Musical.ly was a Chinese-based application which did not promptly respond with law enforcement requests.  Kik was a Canadian-based application that did not store user content, and what limited information was available had to be sought through a lengthy request for mutual legal assistance.  Snapchat designed and promoted its application to have content disappear within a short time of its creation.

offenses against child victims, were more likely to show a pedophilic pattern of sexual arousal than were a combined group of offenders against children"); *see also* U.S.S.C., "*2012 Report to Congress: Federal Child Pornography Offenses,*" ["Report"] Chapter 4, p. 77.  According to the Report, "Sexual interest in children and corresponding sexual gratification are significant motivators for most child pornography offenders.  Offenders often use the images to masturbate and to validate their sexual interest in children."  *Id*.

Even Dr. Howsepian characterized Blanco as having an "above average" risk of reoffending if he were released while in the age range of 40-60.  Howsepian Report dated June 14, 2021, at 6 (last paragraph).  Of course, recidivism is intertwined with someone getting caught for committing a crime; it does not necessarily account for the many people who commit crimes who do not get caught.  Given Blanco's enduring sexual interest in children, the length of time that he demonstrated that interest, his lack of victim empathy (as demonstrated by continuing to sexually exploit and terrorize victims even after – he later told law enforcement – he knew it was wrong), and the absence of protective factors (as discussed by Dr. Napolitano at page 17 of her report), he will always be a risk to harm children by acquiring and viewing child pornography and contacting them through the internet.

### 3.  The Sentence Imposed Must Protect the Public from Blanco

It is reasonable to conclude that if given the opportunity, there is a strong likelihood that the defendant would attempt to again sexually exploit children, due to his sexual attraction to minors and his social isolation. According to *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, Ryan C. W. Hall, M.D. and Richard C.W. Hall, M.D., P.A., Mayo Clin. Proc. 467 (April 2007), "The published rates of recidivism are in the range of 10% to 50% for pedophiles depending on their grouping." *See also* H.R. Rep. No. 107–527 at 2 (2002) ("Studies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes").  Thus, in imposing a sentence for the sexual exploitation of dozens of minors, the court should aim to send a message of deterrence, both to Blanco, with regard to his potential future conduct, and generally to all offenders with a sexual interest in children. An appropriately lengthy sentence is necessary to deter the defendant from repeating this criminal behavior, and to protect children from his actions.

### 4. The Sentence Should Provide Blanco with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.

The defendant would benefit from participating in a lengthy program of sex offender counseling and treatment, and this would best be done within the confines of a Bureau of Prisons (BOP) facility. Each BOP institution has counseling resources available, and each region also has at least one designated sex offender management and treatment program. There is also at least one residential treatment program available for inmates who are concluding their custodial sentences. Imposing the prison term recommended by the government would provide the defendant with just punishment, afford adequate deterrence to him and others, protect the public from his long-standing demonstrated sexual interest in children, and provide the defendant with necessary educational training, medical care, or other correctional treatment.

### C. The kind of sentences available and the sentencing ranges established weigh in favor of an extremely lengthy sentence.

These factors also weigh in favor of the government's recommended sentence, because the ranges for sentencing include mandatory minimum prison terms of five and fifteen years while the maximum terms are twenty and thirty years for each count. Sentences for multiple counts of convictions should be imposed consecutively to achieve a sentence within the USSG range. Probation is expressly precluded by statute under 18 U.S.C. § 3561(a)(2), and the U.S.S.G. range as calculated by the probation office is "life." While life sentences are rare in the federal system, given that Blanco's offense conduct put the range for sentencing well into the zone for a life sentence confirms how serious Blanco's criminal conduct must be treated.

### D. Pertinent Policy Statements by the Sentencing Commission Support a Life Sentence.

Although many defendants and some courts have criticized the punishments for federal child sexual exploitation offenses, Congress has not relented in legislating in this area. Congress enacted the Justice for Victims of Trafficking Act of 2015, Pub. L 144-22, May 29, 2015. Notably, too, although the Sentencing Commission made some adjustments to provisions of U.S.S.G. § 2G2.2 effective November 1, 2016, most of the provisions were not changed. And although they are only advisory, the Guidelines, at 5K2.0 Application Note 4, indicate that downward departures in "child crimes and sexual

20

offenses," including the offenses for which the defendant will be sentenced, are strongly discouraged. This only underscores that Congress and the Sentencing Commission generally believe that the range for sentencing in a case such as before the court is not unduly harsh. So these factors weigh in favor of a sentence within the Guidelines ranges. And while some courts that have criticized the Sentencing Commission's Guideline provisions relevant to the sentencing in this case, there are a significant number of courts that have followed the same provisions and imposed sentences within relevant ranges.

### E. The need to avoid unwarranted sentencing disparities.

It is almost impossible to determine whether one defendant's sentence is disparate from another defendant's sentence unless all relevant facts and sentencing considerations are known. Even when defendants charged with the same offense in the same case are sentenced, very different sentences might not be disparate based on the facts and circumstances related to each defendant and how they committed the offense(s) for which they are sentenced. But many defendants sentenced in the Fresno division of the Eastern District of California have received sentences within the relevant Sentencing Guidelines range for conduct similar to, but not as extensive as, that engaged in by Blanco. Few, if any, defendants have been sentenced for sexually exploiting more than 50 minor victims.

Even though Blanco faces sentencing for five counts of sexual exploitation of minors, and those offenses have more significant consequences than the one count of trafficking in child pornography, the court should not lose sight of how serious the conduct in Count Six was. Blanco admitted that he had acquired a large quantity of child exploitation still and video images that other people had created. Although the PSR references a case agent's estimate (¶ 45) that Blanco had more than 1,000 still images and 390 video files of children being sexually abused, a forensic examiner more familiar with the content recovered from Blanco's devices has given a more recent estimate of at least 1400 still images and 700-1000 videos that were stored on an encrypted drive. Many of these files had descriptive and disturbing titles such as these:

PTHC - sucknew 7yo swallows daddys load (1min 6sec).avi

1yr stephanie.avi

2010 millie shows 9yo pussy.avi

5yo toilet rape (rare).AVI

21

1    Moni 4 - asslick.AVI

2    pthc 9yo girl orgasm 1 webcam (new 2011).avi

3    Luvnlilly 3Y.avi

4  HSI SA Ulises Solorio reported that the longest video appears to be approximately 48 minutes in length.

5  Blanco admitted that he masturbated while viewing this material, and he suggested that he moved onto

6  creating his own sexual exploitation material, because it seemed more real to him.

7          The offense conduct in Count Six is arguably more insidious and damaging than that in a more

8  typical case involving an offender convicted for violating the same statute.  More typically, sentencing

9  for a conviction involving a violation of 18 U.S.C. § 2252(a)(2) involves a single defendant who has

10  obtained contraband through a peer-to-peer file-sharing program or by exchanging it with one or more

11  other offenders.  The Ninth Circuit has upheld as reasonable 210-month prison terms for defendants

12  convicted for a single count of receipt or distribution of child pornography when the defendant was

13  approximately the same age as Blanco, had no prior criminal history, and there was no indication that

14  the defendant had progressed to directly sexually exploiting minor victims through personal

15  communications.  *See, e.g., United States v. Lynn*, 636 F.3d 1127 (9th Cir. 2011); *United States v. Maier*,

16  646 F.3d 1148 (9th Cir. 2011).  More recently a defendant received the statutory maximum sentence of

17  240 months, although the conviction was vacated due to the Ninth Circuit's finding that the district court

18  had not sufficiently advised the defendant about the risks of representing himself at trial.  *United States*

19  *v. Cragg*, 1:17-cr-00012 DAD.

20          The government references the cases above to illustrate that other sentences in Fresno have been

21  lengthy and close to the Guidelines range even when that offense was limited to the conduct identified in

22  Count Six of the superseding indictment.  But Blanco's overall offense conduct was obviously more

23  significant, and his sentence needs to be correspondingly more severe.  So cases in which sentencing

24  was for offense conduct involving the sexual exploitation of minors can also be informative.

25  Understandably, when defendants have engaged in conduct beyond receiving or distributing images of

26  child sexual abuse, sentences have tended to be more severe.  For example, in *United States v. Aguirre*,

27  1:17-cr-00434 AWI, the Ninth Circuit upheld as reasonable a 30-year prison term and lifetime

28  supervised release for a 29-year-old defendant with no prior criminal history.  He had exchanged images

of child sexual abuse with other offenders and also engaged in inappropriate contact with a 17-year-old student, although he was neither prosecuted nor convicted for any contact offense. In *United States v. Ronell,* 1:06-cr-00066 LJO, the court initially sentenced the defendant, who was in Criminal History Category I, to 30 years imprisonment for his convictions for one count of receipt or distribution of child pornography and one count of sexual exploitation of a minor. The Ninth Circuit upheld the defendant's conviction and sentence on appeal.[25] And a defendant with a prior conviction in 2000 in federal court for possession of child sexual abuse images as well as a misdemeanor conviction for unlawful sexual intercourse with a minor in approximately 1991 received a 30-year sentence for his conviction for receipt or distribution of similar material in *United States v. Metcalfe,* 1:14-cr-00012-LJO.

More severe sentences, appropriately, have been imposed on defendants who have victimized more than one minor. In *United States v. McCormack,* 1:11-cr-324-AWI, a 31-year-old defendant was sentenced to life imprisonment for his convictions, after a jury trial, for two counts of kidnapping and sexual exploitation of two minors. The defendant secretly removed the two toddler victims from their residence while their parents were sleeping and created still and video images of the victims. In *United States v. Perez,* 1:18-cr-211 LJO, the defendant admitted in a plea agreement that he used Skype, Kik, Discord, Snapchat, and LiveMe to communicate with minors for the purpose of soliciting sexually explicit images of those minors. He admitted that he persuaded victims, at times with promises of payments and at other times with threats, to pose nude or engage in sexually explicit activities, sometimes with other minors. He also admitted that he sent some of the material that he had requested to other people. The sentence of 40-year imprisonment, lifetime supervised release, with restitution and assessments totaling $17,800 took into account that the case was resolved approximately six months after it started without any motions but with a waiver of all appellate and collateral attack rights.

In the cases of *United States v. Jennifer Thurman and Steven Arthur,* 1:08-cr-00058 OWW, the defendants had access to four minor females and used those minors to create video images of themselves sexually abusing the victims while they were not fully conscious at various times during a three-month

---

[25] The defendant ultimately accepted a sentence of 198 months after cooperating with law enforcement and litigating his claim of ineffective assistance of counsel regarding advise about his right to appeal a motion to suppress that had been denied.

period in 2007.  Arthur and Thurman were able to commit their crimes, in part, by administering a sedative to the victims but there was no evidence that they ever distributed the material or shared it with any other people.  Both defendants were charged with crimes in state court but were sentenced in their federal cases first.  Thurman, then age 35, and Arthur, then age 34, each received 120-year federal prison sentences followed by state prison sentences of 73 and 75 years.

### F.  The need to provide restitution to any victims of the offense.

The defendant agreed to pay restitution in the full amount of the losses to any party whom the court deems a victim.   The U.S. Attorney's Office has and will continue to provide copies of any restitution request(s) and associated documentation to the court and defense counsel.

### V.   JVTA Assessment

The Justice for Victims of Trafficking Act (JVTA) of 2015 might require the defendant to pay a $5,000 special assessment per count for each crime listed in Chapter 110. 18 U.S.C. § 3014(a).  Each of the six counts of conviction would require a separate $5,000.00 assessment.  As of this submission, the legislation was to expire on September 30, 2021, but it might have been extended by the time of the sentencing hearing.

### VI.   SENTENCING EXHIBITS, TESTIMONY, AND IMPACT STATEMENTS

The United States reserves the right to present testimony, exhibits (including samples of the defendant's child exploitation images and other material recovered during the investigation), and a supplemental filing in response to any memoranda or exhibits that the defendant files or chooses to introduce prior to or at sentencing.  The undersigned will make available for review by defense counsel prior to the sentencing hearing any additional exhibits which are not submitted with this filing and which the United States will seek to offer into evidence.  The government has been in communication with several victim families who have been following this case since they were first notified by law enforcement.  Although it is unlikely that they will be able to attend the sentencing hearing in person, one or more persons might ask for permission to address the court by phone or video connection.

///
///
///

1

## VII.   CONCLUSION

In requesting a within-Guidelines sentence of imprisonment, the government has taken into account the seriousness of the defendant's criminal conduct, the large number of minor victims, the impact that the defendant's conduct has had – and will continue to have – on the dozens of minor victims, the defendant's demonstrated and unaddressed sexual interest in children, and all other relevant 3553(a) factors.  For the reasons stated above, the United States asks the court to follow the recommendations in this memorandum.

PHILLIP A. TALBERT
Acting United States Attorney

By:  /s/ David Gappa
David Gappa
Assistant United States Attorney

/s/ Nadia Prinz
Nadia C. Prinz
Trial Attorney
United States Department of Justice
Criminal Division
Child Exploitation and Obscenity Section